UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

SHARON EDWARDS,

                                    Plaintiff,          Case # 10-CV-6553-FPG

v.                                                      DECISION AND ORDER

ROCHESTER INSTITUTE OF TECHNOLOGY
& DR. DONALD BOYD,
                                    Defendants.
_____

## INTRODUCTION

Plaintiff Sharon Edwards commenced this action alleging racial discrimination against her former employer, Rochester Institute of Technology ("RIT") in violation of Title VII of the Civil Rights Act, 42 U.S.C. §2000e, *et seq.*, the New York State Human Rights Law, N.Y. Exec. Law § 290, et seq. ("NYSHRL"), and 42 U.S.C. § 1981.[1] She also alleges gender discrimination in violation of Title VII with respect to her termination only. ECF Nos. 1, 93.

Currently pending before the Court is Defendants' Motion for Summary Judgment. ECF No. 132. Having considered the moving papers, the record evidence, and the applicable law, the Court grants Defendants' motion and dismisses the Amended Complaint in its entirety.

## PROCEDURAL HISTORY

Plaintiff commenced this action on September 27, 2010. ECF No. 1. Before Defendants filed an Answer, Plaintiff filed an Amended Complaint dated October 8, 2010. ECF No. 2. At the time this action was commenced, Plaintiff was represented by Christina Agola, Esq., but Ms. Agola withdrew as counsel in December 2011. ECF No. 15. Plaintiff proceeded *pro se* until December

---

[1] Plaintiff advances the Section 1981 claims against Defendant Dr. Donald Boyd in his individual capacity.

4, 2012, when Plaintiff's current attorney, Prathima C. Reddy, Esq., entered a Notice of Appearance. ECF No. 58.

By that time, discovery was completed and the deadline to file dispositive motions was December 17, 2012. ECF No. 56. Defendants filed a summary judgment motion on December 17, 2012. ECF Nos. 59-60. Plaintiff opposed the motion and moved to amend the complaint and to reopen discovery. Plaintiff also filed a separate motion to stay the determination of the summary judgment motion pending further discovery regarding Plaintiff's termination. ECF Nos. 68, 72. By Order dated August 22, 2013, Magistrate Judge Marian W. Payson granted Plaintiff's motion to amend and permitted Plaintiff to add new claims for racial discrimination and retaliation based on her termination; permitted an additional claim for gender discrimination under Title VII based on her termination only; denied Plaintiff's request to add additional claims of gender discrimination under the NYSHRL; and permitted Plaintiff to conduct limited discovery regarding her termination. ECF No. 90.

Plaintiff filed her Second Amended Complaint on September 23, 2013 (ECF No. 93), which contains six separate causes of action: (1) the first cause of action, asserted against RIT and Dr. Boyd, alleges discrimination in the form of disparate treatment and unlawful termination based on race in violation of 42 U.S.C. § 1981; (2) the second cause of action, asserted against RIT under Title VII, alleges discrimination based on race in the form of disparate treatment and unlawful termination; and discrimination based on gender solely based on her termination; (3) the third cause of action, asserted against RIT, alleges discrimination based on race in the form of disparate treatment and unlawful termination in violation of the NYSHRL; (4) the fourth cause of action, asserted against RIT and Dr. Boyd, alleges retaliation in violation of 42 U.S.C. § 1981; (5) the fifth

cause of action, asserted against RIT, alleges retaliation in violation of Title VII; and (6) the sixth cause of action, asserted against RIT, alleges retaliation in violation of the NYSHRL. *Id.*

In a Decision and Order dated September 26, 2013, this Court granted Plaintiff's motion to stay the summary judgment proceedings pending the completion of further discovery on Plaintiff's wrongful termination claims. ECF No. 94. Defendants withdrew their prior motion for summary judgment. ECF No. 130.

The current pending motion addresses all of the claims raised in Plaintiff's Second Amended Complaint. ECF No. 132. In support of their motion, Defendants submit a Statement of Undisputed Facts with Appendix Exhibits 1 through 28 ("Def. Appx. Ex."); Memorandum of Law ("Def. Mem."); Attorney Declaration ("Atty. Decl."); and Declaration of Tamara Gouger ("Gouger Decl.") with Supporting Exhibits 1 through 10. ECF Nos. 132-136.

Plaintiff submitted a Response to Defendants' Statement of Undisputed Facts; Memorandum in Opposition to Defendants' Motion; Attorney Declaration with Supporting Exhibits 1 through 29; and Plaintiff's Affidavit with Supporting Exhibits 1 through 100. ECF Nos. 153-180.

On April 28, 2017, the same day Defendants' Reply was due, Plaintiff filed additional Supporting Exhibits 101 through 105, which appears to be a corrected filing as those exhibits were cited in her Memorandum (ECF No. 177 at 33) but not included in her Opposition papers. ECF No. 183.

Following Defendants' Reply on April 28, 2017 (ECF No. 184), and after receiving permission from the Court to file a limited Sur-Reply (ECF No. 187), Plaintiff filed an Amended Affidavit by Plaintiff; an Attorney Declaration in Support of Sur-Reply with Supporting Exhibit 1; and Memorandum of Sur-Reply. ECF Nos. 188-190, 192.

The Court must point out the numerous deficiencies in Plaintiff's submissions. First, Plaintiff's Response to Defendants' Rule 56 Statement does not comply with the Local Rules of Civil Procedure, which require "correspondingly numbered paragraphs, and, if necessary, additional paragraphs containing a short and concise statement of additional material facts as to which it is contended there exists a genuine issue to be tried." Loc. R. Civ. P. 56(a)(2). Rather, Plaintiff "contests" the majority of the propounded facts in narrative form, often without citing evidence and/or without responding to or specifically controverting the facts asserted. In accordance with this District's Local Rules, the Court deems admitted any properly supported facts asserted against Plaintiff. Loc. R. Civ. P. 56(a)(2) ("Each numbered paragraph in the moving party's statement of material facts may be deemed admitted for purposes of the motion unless it is specifically controverted by a correspondingly numbered paragraph in the opposing statement.").

Second, Plaintiff utilizes this submission to assert new claims. *E.g.,* Pl. Opp'n Stmt., ¶ 18. The Court therefore disregards any improperly raised new claims at this stage. *See Lyman v. CSX Transp., Inc.*, 364 F. App'x 699, 701 (2d Cir. 2010) ("An opposition to a summary judgment motion is not the place for a plaintiff to raise new claims.").

Finally, the Court does not consider the paragraphs of Plaintiff's Affidavit (ECF Nos. 165, 188 (Amended)) that contradict her sworn deposition testimony, rely on documents not produced in discovery or inadmissible evidence, are unsupported by her evidentiary submissions, or that do not contain adequate citations to the record to support her contentions. *See Point 4 Data Corp. v. Tri-State Surgical Supply & Equip., Ltd.*, No. 11-CV-726, 2013 WL 4409434, at *22 (E.D.N.Y. Aug. 2, 2013), *report and recommendation adopted as modified*, 2013 WL 5502852 (E.D.N.Y. Oct. 1, 2013), *and report and recommendation adopted*, 2014 WL 12769275 (E.D.N.Y. Sept. 17, 2014) ("If plaintiffs' counsel expects the Court to 'scour the record' to document the facts posited

in their legal arguments, 'that is simply not our job, at least in a counseled case.'") (quoting *Sioson v. Knights of Columbu*s, 303 F.3d 458, 460 (2d Cir. 2002)); *Fernandez v. DeLeno*, 71 F. Supp. 2d 224, 227-28 (S.D.N.Y. 1999) ("counsel simply, in effect, pointed to virtually the entire body of extensive discovery in this case without any evidentiary affidavits or other meaningful identification of triable facts in the record, in effect, inviting this Court to peruse a haystack looking for needles. This invitation is not only inconsistent with the plain requirements of Local Civil Rule 56.1 but, if accepted, would eviscerate summary judgment as an efficient tool for distinguishing claims that should be tried from those that need not be tried.").

Therefore, unless otherwise noted, after reviewing the depositions, declarations, exhibits, and other evidence and pleadings, the Court has determined that the following facts are beyond genuine dispute and supported by admissible evidence.

## FACTUAL BACKGROUND

### I. Plaintiff's Employment with RIT

Plaintiff, an African-American female, began working at RIT in May of 2003. Before joining RIT, Plaintiff earned a Bachelor's Degree in Business Administration from RIT in 1996 and a Master's Degree in Management from Nazareth College in 2003 with a major in Accounting.

Plaintiff testified that she had been unemployed before 2003, but also that she was sporadically employed in various positions, performing mostly clerical and secretarial work, between February 1983 and April 2002, typically for only a few months at a time. Pl. Dep. 18-25; Gouger Ex. 1. Plaintiff states that her temporary positions were to accommodate her school schedule, and that her time off was spent caring for her children. Pl. Aff. ¶ 3-4, Ex. 2. After graduating high school, Plaintiff worked at Harter Secrest & Emery LLP in the collections department performing billing work. That position ended in 1992. Pl. Dep. 18-25.

RIT hired Plaintiff as an Operations Coordinator for Venture Creations. Venture Creations was created in 2001 as a new business incubator to create an environment for the development of new, technologically innovative businesses. Venture Creations aids in the development of these new businesses by facilitating their design, development, construction, and operation, with the overall goal of promoting education and research. Various new business start-ups are located at the Venture Creations' facility, located off-campus from RIT, and RIT facilitates their development. In turn, RIT charges fees to the businesses for their use and occupancy of the Venture Creations' facility.

Defendants state that Plaintiff was responsible for various administrative tasks associated with Venture Creations, such as ensuring that office space was prepared for companies to move-in, ensuring that companies were invoiced for their licensing fees, making sure supplies were stocked, arranging for office keys to be made for new companies, ensuring that the facility was property maintained by coordinating with facilities management, assisting companies with internet technologies issues by coordinating with RIT's internet technologies services department, and arranging for the board meetings of Venture Creations. Def. Appx. Ex. 27 ("Boyd Aff.") ¶ 5; Pl. Dep. 65-70. Plaintiff, on the other hand, states that although she was hired as an "Incubator Operations Coordinator," her position involved far greater responsibilities than administrative tasks, and required a BS in Accounting with three to five years' experience. Pl. Aff. ¶¶ 8-14, Exs. 1, 4, 6.

During most of Plaintiff's employment, the Venture Creations staff primarily consisted of the Executive Director and Plaintiff. RIT also employed certain other individuals to serve Venture Creations as business consultants. Gouger Decl. ¶¶ 3-4. Plaintiff claims that in 2006, a woman

named Anita Rohr was hired to take on the administrative roles, and that in 2007, William Jones was hired to help with operations. Pl. Aff. ¶¶ 4-6, Exs. 2, 16.

Plaintiff reported to the Director of Venture Creations. Boyd Aff. ¶¶ 4-6; Pl. Dep. 27-28. From 2004 to 2005, she reported to Lynn Kelly, and then to Mick Stadler in 2005 and 2006. Pl. Dep. 27-28. Plaintiff testified that she also reported to Dr. Don Boyd, RIT's Vice President of Research throughout her employment up to his retirement in 2011. *Id*.; Pl. Aff. ¶ 16.

From approximately September 2006 until mid-2007, the Venture Creations Director position was vacant, at which point Jerry Mahone was hired as Director of Venture Creations and served in that capacity until June 2010. Mr. Mahone is African-American. Plaintiff reported directly to Mr. Mahone during his tenure as Director of Venture Creations. Plaintiff states that Mahone also worked under Boyd. Pl. Aff. ¶¶ 16, 31-33.

As previously mentioned, Venture Creations employed Rohr, a Caucasian female, as an Operations Coordinator from approximately 2007 through her termination in February 2011. Plaintiff had repeated conflicts with Rohr. Plaintiff testified that initially their relationship was good, but later deteriorated because Plaintiff received tuition assistance from RIT for her doctoral studies conducted through the University of Phoenix, and Plaintiff was permitted by their then-supervisor, Mahone, to do her homework at work. Plaintiff testified that Rohr resented the fact that RIT and Mahone had assisted her in this manner. Pl. Dep. 127-35.

Plaintiff's conflicts with Rohr involved, for example, Plaintiff's belief that Rohr infringed on her job responsibilities by performing tasks such as requesting that the air conditioner be fixed or attempting to fix the copier . Pl. Dep. 136-39, 282-84.

Between April and August of 2009, Plaintiff was out of work on disability in connection with foot surgery. Pl. Dep. 35-36.

## II.    Alleged Adverse Actions

Plaintiff claims that she suffered the following adverse employment actions based on her race: (1) beginning in 2006, a delay on RIT's part in changing her position's title in RIT's Human Resources Computer Software, Oracle, from Operations Coordinator to Operations Manager; (2) RIT's failure to promote Plaintiff; (3) the reclassification of Plaintiff's position from exempt to non-exempt under the Fair Labor Standards Act ("FLSA"); (4) generally, Plaintiff's job responsibilities performing only clerical and administrative work; (5) Plaintiff's attendance at a meeting on November 16, 2009, during which Plaintiff was accused of various deficiencies related to her work performance; (6) a negative performance appraisal ("PA") in September, 2011; (7) a September 2011 written warning; and (8) her temporary suspension with pay after an incident involving her then-supervisor, Jones; and (9) termination from RIT based on her race and/or gender.

### A.    Delay in Updating Plaintiff's Title

In or around October 2006, shortly after Dr. Boyd began serving as Interim Director of Venture Creations, he informed Plaintiff that she would receive a three percent pay increase, and that her title would change from "Operations Coordinator" to "Operations Manager." Boyd Aff. ¶ 10, Boyd Ex. 22; Pl. Dep. 109-10. Plaintiff's title change was not implemented within RIT's Human Resources Computer Software, Oracle, until March 2009.  Boyd Aff. ¶ 12; Pl. Dep. 110; Gouger Decl. ¶ 7. Nevertheless, Plaintiff began using the "Operations Manager" title immediately. Boyd. Ex. 23; Pl. Dep. 110.

The delay in updating Plaintiff's title in Oracle was a processing error based on the inadvertent failure to submit the correct Employee Action Form for the changed to be processed. Gouger Decl. ¶ 8. Although Oracle did not reflect the title change, Plaintiff's pay increase was

properly processed. *Id.* ¶ 9. Plaintiff notified RIT President Dr. William Destler of the error in February of 2009. Boyd Aff. ¶ 13; Pl. Aff. ¶ 60, Ex. 40; Reddy Decl., Ex. 8. Plaintiff testified that the title change had no practical impact on her day-to-day responsibilities and wages. Pl. Dep. 110-12.

### B.    Failure to Promote

Plaintiff initially testified that while at RIT, she applied for 50 to 60 positions within RIT, but later changed her testimony, ultimately admitting to having applied for only four positions at RIT. Pl. Dep. 117, 227. Those positions were: (1) counselor position 5527 in the Higher Education Opportunity Program; (2) a managerial position, PC number 8458, in the HUB Crossroads facility; (3) a director of orientation position, PC number 1753; and (4) a business manager position in the Center for Arts and Sciences. Pl. Dep. 227-231, 247. With respect the managerial position, Plaintiff testified that she did not possess the technical skills or meet the qualifications required for that position. Pl. Dep. 238-41. Plaintiff's applications for these positions date back to 2006 and 2007, and she did not apply for any other positions within RIT after August 2007—rather, she "networked." Pl. Dep. 253. She explained that "discrimination enters your surroundings when you are applying for positions and you are constantly declined," but acknowledged that she did not know who ultimately took those positions, and that RIT did not retaliate against her by not hiring her for those four positions. Pl. Dep. 242-49.

Plaintiff also alleges that she was treated differently than certain of her co-workers, purportedly because of her race, with respect to her inability to secure an unspecified promotion. ECF No. 93 ¶¶ 23-26. Specifically, Plaintiff's Second Amended Complaint cites to Kelly, a former supervisor, as a similarly situated Caucasian co-worker who was allegedly treated more favorably, *id.* ¶¶ 22-24, but Plaintiff never applied for Kelly's position. Pl. Dep. 170-71. During the relevant

time period, Kelly was the Controller and Assistant Treasurer of RIT and RIT employed her for approximately 20 years. Kelly has an Executive Master's Degree and has held various positions within the Finance and Administration Division of RIT, including Manager of Accounting, Director of Accounting, Director of Accounting and Payroll, Assistant Controller, Associate Controller, and Controller and Assistant Treasurer. Boyd Aff. ¶ 24.

Plaintiff also alleges that, following the departure of Mahone, who is also African-American, she was "never given an opportunity to apply" for the position of Executive Director of Venture Creations because the position was posted on May 24, 2011, when she was on vacation. ECF No. 93 ¶¶ 72-74; Pl. Dep. 41.  At the time, Jones, who is Caucasian, had been serving as the Interim Director of Venture Creations and he ultimately took the permanent role in May of 2011. Jones Dep. 22-24.

Jones also temporarily served as the Interim Director of Venture Creations in 2007, prior to Mahone's hiring. Jones again worked for RIT in 2008 as a part-time consultant working with Venture Creations' businesses. He then served as a business development manager for the New York State Energy Research and Development Authority Clean Energy Incubator when it was established in December 2009. Jones has a Bachelor of Architecture degree from Syracuse University and additional graduate courses in finance and business administration from RIT. His experience included founding and managing FM Technologies (a facilities design and project management company), and working with organizations like Syracuse University, Catholic University, University of Maryland, Kodak, and Xerox. Boyd Aff. ¶ 26. Plaintiff characterizes this work experience as "spotty," that his education and skills were "dated," and he "did not have higher level education." Pl. Opp'n Stmt. ¶ 41.

Defendant states that Plaintiff has been enrolled in an online program at the University of Phoenix since 2007, with the goal of obtaining her doctorate degree, but did not complete it. Pl. Dep. 11-16. Further, Plaintiff provided conflicting testimony regarding her employment activities before RIT employed her in 2003, stating initially that she could not remember any of her employment after graduating from high school; then testifying that she was unemployed before working for RIT; and later testifying that she performed temporary "receptionist" or "clerical" work for Manpower. Pl. Dep. 18-26. Plaintiff also recalled that she worked at Harter Secrest & Emery after high school in the collections department for approximately nine years until 1992. Pl. Dep. 20-23. Plaintiff contends that she "complete[d] her doctorate studies in Educational Leadership," but does not specify when. Pl. Aff. ¶¶ 2-24.[2] She further notes that when the Executive Director position opened in 2011, Plaintiff had been working with Venture Creations for over five years with a "proven track record." *Id.*

## C. Reclassification of Plaintiff's Position to Non-Exempt

In or around March of 2007, RIT settled threatened class action litigation related to alleged FLSA violations. This entailed a campus-wide review of RIT's employees' job functions, to ensure that the employees were properly classified as exempt or non-exempt. Effective April 16, 2007, more than 160 RIT employees were reclassified from exempt to non-exempt. Plaintiff's position was one of the reclassified positions. In connection with the reclassification, RIT sent Plaintiff a letter explaining that the reclassification was merely a "legal conclusion" and that it did "not indicate the importance of the position or its status within the University." Boyd Aff. ¶ 15, Ex. 24. She testified that she was aware that the reclassification occurred campus-wide and that other employees' positions also underwent the reclassification procedure. Without further explanation,

---

[2] Plaintiff's Exhibits 1-8, which she cites to for the assertion that she completed her doctorate degree, do not appear to support her contention. Pl. Ex. 1-8.

Plaintiff states that she was disadvantaged by the reclassification while the Caucasian reclassified employees were not. Pl. Aff. ¶¶ 42-43, 56, Ex. 46; Pl. Dep. 99-100. She testified, however, that her duties remained the same, she made "about the same amount of money," and that she was entitled to overtime and received overtime pay when she worked over 40 hours. *Id.* 94-96.

According to Plaintiff, she functioned at a "Director level" before the reclassification. Defendant maintains that her work duties were secretarial and clerical in nature. Pl. Dep. 112; Pl. Aff. ¶¶ 3, 12, 32, 33, Exs. 1, 6-7. Plaintiff suggests that the reclassification "limited" her to clerical work and thus decreased her earning potential. Pl. Aff. 42, 43, 56, 170, Exs. 25-26. The reclassification of Plaintiff's position to non-exempt meant that Plaintiff was paid on an hourly basis rather than being paid a set salary. Pl. Dep. 94. Because of this change, Plaintiff was to be paid for any time worked over 40 hours. Boyd Aff. ¶ 16; Pl. Dep. 95-96. Plaintiff contends that the reclassification no longer allowed her a flexible work schedule so that she could not complete her doctoral coursework. Pl. Opp'n Stmt. ¶ 49.

In mid-2008, Plaintiff and Gouger discussed her FLSA classification. Gouger asked Plaintiff to fill out a detailed job description questionnaire that RIT used to determine which positions should be classified as exempt or non-exempt. Based on Plaintiff's responses to that questionnaire, Gouger confirmed that Plaintiff's position was correctly classified as non-exempt. Gouger Decl. ¶ 6, Ex. 2.

### D.   Plaintiff's Job Duties

Plaintiff testified that her job with Venture Creations always involved primarily secretarial and clerical work, Pl. Dep. 65-69, 112, a statement that she now denies. Pl. Aff. ¶¶ 11, 13, Exs. 6-7. Even after Mahone became her supervisor, she claims that she "ran that facility." Pl. Dep. 151.

Plaintiff testified that in 2009 she requested a meeting with Boyd and Mahone to determine the responsibilities of her position. At the meeting, Boyd "asked her what did she want to do and what responsibilities did she have."  Pl. Dep. 105-09. Plaintiff stated that she believed that, throughout her tenure at RIT, "there was a problem with our job responsibilities" and that one of the reasons for this was that the job responsibilities were "not defined."  Pl. Dep. 140.

Plaintiff declined certain tasks because she believed they were not part of her job description. For example, Plaintiff was asked to maintain the Venture Creations' website. Plaintiff turned down the offer because she believed that it would not provide her the "opportunity to be creative and innovative." Def. Appx. Ex. 24-25.

### E.  November 16, 2009 Meeting

Plaintiff testified that on November 12, 2009, Mahone informed her that a staff meeting would take place on November 16, 2009. Pl. Dep. 47. Plaintiff, Mahone, Boyd, and Gouger attended the meeting, which was intended to counsel Plaintiff regarding her work performance and her continued conflicts with her co-workers. Boyd Aff. ¶¶ 30-31; Gouger Decl. ¶ 12; Pl. Dep. 47. Plaintiff states that there is no documentation to support that the meeting was a "counseling" in accordance with RIT's Progressive Discipline Policy. Pl. Aff. ¶ 85, Ex. 51.

During that meeting, Plaintiff alleges that she was accused of having an unprofessional attitude, "hindering customers at Venture Creations," starting rumors about Mahone purportedly viewing inappropriate material on his computer, not recording her time properly, and not getting along with other individuals on campus. Pl. Dep. 47.

Plaintiff also states that she recorded the November 16, 2009 meeting, but the recording was damaged as a result of computer problems when her husband attempted to retrieve the audio file. Pl. Dep. 79-84, 254-59. Plaintiff testified that no further action was taken in connection with

any of the purported allegations made at the November 16, 2009 meeting, and that nothing that was said at that meeting led her to believe that the meeting was related to her race. *Id.* at 48, 62-63. Plaintiff later filed discrimination and retaliation charges with the Equal Employment Opportunity Commission ("EEOC") in connection with the meeting.

Plaintiff testified that she experienced problems with approximately nine or ten different RIT employees. Pl. Dep. 56-58. According to Plaintiff, the problems were always the fault of her co-workers. *Id.* She conceded that she had a history of not working well with other women even before RIT employed her. Pl. Dep. 193-94.

At RIT, Plaintiff was involved in several incidents involving Rohr, her female co-worker. Boyd Aff. ¶¶ 18-19; Pl. Dep. 127-128, 133-135. Plaintiff testified that she yelled at Rohr in the workplace approximately four separate times. Pl. Dep. 149-50. One of the incidents led Plaintiff to tell Rohr: "be a professional and stop the child's play. You're too old to be acting like a two year old." Boyd Aff. ¶ 18, Ex. 25.

### F.     Plaintiff's 2011 Performance Appraisal

In mid-2010, Jones became the Interim Director of Venture Creations, upon Mahone's departure. Boyd Aff. ¶ 26. Plaintiff testified that, until she received her PA in September of 2011, she and Jones had "a great employee-employer relationship." Pl. Dep. 262-64. Plaintiff states that the relationship deteriorated when Jones learned of her EEOC complaint and lawsuit. Pl. Aff. ¶ 102.

Between January and September of 2011, Jones, in consultation with Gouger, verbally counselled Plaintiff regarding her work performance on several occasions. *See, e.g.*, Jones Dep. 95-102; Gouger Decl. ¶¶ 13-14; Bender Dep. 136-37; 164-65. For example, Plaintiff was verbally counselled regarding her failure to complete work assignments, her continued conflicts with Rohr,

and her negative responses to her supervisor regarding work requests. Bender Dep. 150; Jones Dep. 95-102. Plaintiff claims that she received a verbal warning only on September 20, 2011, in addition to her PA, and that she was never disciplined under Boyd's supervision. Pl. Aff. ¶¶ 97, 105, Exs. 58, 67.

Plaintiff's September 2011 PA addressed various problems with Plaintiff's performance. Raffaelle Dep. 29-31. The assessment was made by Jones, who had not been the subject of a discrimination charge by Plaintiff until after the PA was issued. Def. Appx. Exs. 6-13. The PA indicated an overall rating of 1.8 out of 5. Pl. Dep. 262; Gouger Ex. 3. Plaintiff claims, however, that the PA came after Jones became aware of her lawsuit against RIT, which she filed in September of the previous year. Further, Plaintiff claims that her prior performance reviews were positive. Pl. Aff. ¶¶ 105-06, 115, Exs. 65, 71-73.

The PA in question addressed Plaintiff's persistent failure to arrive to work on time and to schedule time off in advance; inability to work cooperatively with co-workers and involvement in verbal altercations at work; habit of working with her office door closed or cracked open, making it appear as though she was unavailable to assist others; unsatisfactory response to management direction and practice of working solely within the parameters of her written job description, which hindered her performance; and failure to maintain the Venture Creations' website even though it was her responsibility. Gouger Ex. 3; Pl. Dep. 267-70, 274-75.

Plaintiff testified that when Jones asked her to perform various tasks, she told him: "I know how to do my job." Pl. Dep. 270-71. She further testified that, despite the fact that Jones was her supervisor, she trained him and that she was "a major player" in the facility. *Id.* at 271-72. According to Plaintiff, Jones saw her as a threat to him because customers would seek out Plaintiff instead of Jones for assistance. *Id.* at 279-80.

After Plaintiff's September 20, 2011 Performance Appraisal, she failed to give Jones a status update on various issues, for example, outstanding space licenses and licensing fees, which he requested multiple times. Accordingly, Jones issued Plaintiff a written warning on September 27, 2011. Gouger Decl. ¶ 16, Ex. 4.

### G. Incident with William Jones and Subsequent Suspension

Shortly after receiving the Performance Appraisal, on October 6, 2011, Plaintiff and Jones were involved in a verbal altercation that resulted in their temporary suspension with pay, while RIT's Human Resources Department investigated. Pl. Dep. 289; Jones Dep. 30-33; Gouger Decl. ¶¶ 17-20, Exs. 5-6. Plaintiff states that during the incident, Jones was physically and verbally aggressive toward her, but does not specify what Jones allegedly did or said. Pl. Aff. ¶¶ 119, 163, Ex. 75.

Plaintiff and Jones were informed that they could return to work within one week. Jones returned to work, although he was reprimanded for his conduct in connection with the October 6th incident. Bender Dep. 173-74; Gouger Decl. ¶¶ 19-20, Ex. 7. Plaintiff did not immediately return to work, and instead notified RIT that she would be taking short-term disability leave for a foot surgery. Pl. Dep. 290, 448; Gouger Decl. ¶¶ 20-21. Plaintiff was out on disability between October 7, 2011 and April 3, 2012. *Id.*

### H. Plaintiff's Return to Work in April 2012 and Subsequent Termination

When Plaintiff returned to work on April 3, 2012, RIT facilitated a work arrangement whereby Plaintiff and Jones had very limited interaction during the workday to avoid further confrontation. To accomplish this, RIT scheduled Plaintiff to work at its main campus in the morning and at Venture Creations in the afternoon. Conversely, RIT scheduled Jones to work at Venture Creations in the morning and at the main campus in the afternoon. Thus, Plaintiff and

Jones were only physically in the same place during weekly staff meetings. Bender Dep. 180-81; Def. Appx. Ex. 23. Plaintiff contends that her removal from the Venture Creations office placed her into a "filthy, dysfunctional office without immediate computer access," while Jones was permitted to work in Vice President of Research and Associate Provost Dr. Ryne Raffaelle's office or at home. Pl. Aff. ¶¶ 16, 159.

Plaintiff also began reporting directly to Raffaelle, who had taken over for Boyd upon his retirement. Raffaelle Dep. 25. Plaintiff states that Raffaelle did not supervise her, refused to meet with her, and asked Jones to write a status report regarding Plaintiff's work that ultimately resulted in her termination. Pl. Aff. ¶ 156, 167.

Upon her return, Raffaelle and Human Resources Representative Judy Bender met with Plaintiff and gave her a "Performance Expectations – Final Written Warning" memorandum on April 3, 2012. During the meeting and in the memorandum, Raffaelle detailed the prior similar warnings Plaintiff received and his expectations regarding areas in which she needed immediate, consistent, and sustained improvement. Raffaelle Dep. 29-30; Pl. Dep. 293-94; Def. Appx. Ex. 23. Plaintiff maintains that she never had performance issues. Pl. Aff. ¶¶ 174-75.

Further, because Plaintiff repeatedly complained that she was being asked to perform work outside of her job description and that her job was not properly defined, Raffaelle also provided her a detailed work plan so that her work expectations were clear. Plaintiff assured Raffaelle that she could accomplish the tasks on the work plan with no problem. Def. Appx. Ex. 25-26; Raffaelle Dep. 29-30, 65-66; Pl. Dep. 29-94, 394; Bender Dep. 74.

Soon after Plaintiff returned to work, she failed to comply with the expectations set forth in the Final Written Warning and the work plan. For example, Plaintiff: (1) failed to submit invoices to the Venture Creations' companies for certain payments due by May 1, 2012; (2) failed

to notify all Venture Creations' companies of her return to work on April 3, 2012, instead only notifying approximately nine out of approximately 23 companies; (3) failed to obtain secure keys for two of the Venture Creations' companies; (4) failed to obtain updated certificates of insurance; and (5) only attended one staff meeting at which she did not take minutes (despite instructions that she was expected to do so). Pl. Dep. 303-06, 368, 383; Def. Appx. Ex. 26 (noting that Plaintiff was responsible for resolving all issues with certificates of insurance).

Plaintiff was supposed to give Raffaelle reports concerning her work performance, but she failed to fulfill that obligation. Raffaelle Dep. 92-93. Plaintiff failed to complete almost all of the tasks in the work plan. Bender Dep. 261. Plaintiff conceded that she did not: invoice any of the companies within Venture Creations; provide keys to several of the companies that requested them; email the companies notifying them of her return; and work with at least one individual within the Ventures Creation facility who requested help connecting his computer to the printers. Pl. Dep. 303-307. She also continued to have difficulty dealing with co-workers. Raffaelle Dep. 143-44.

Raffaelle met with Plaintiff and Bender on May 1, 2012 to confirm whether Plaintiff accomplished the work plan tasks. Raffaelle Dep. 89, 137-39. Plaintiff admitted that she had not accomplished most of the tasks. Raffaelle Dep. 85-86, 159; Bender Dep. 261. As a result, Plaintiff was terminated effective May 1, 2012, failing to perform the essential functions of her job. Raffaelle Dep. 83-86; Bender Dep. 105-08; Pl. Dep. 22, 302. Plaintiff, relying on her sworn affidavit, contends that she completed her work assignments but had no opportunity to present her results to Raffaelle. Pl. Aff. ¶¶ 150-54, 162.

Raffaelle asked Jones to draft a status report dated April 30, 2012 that detailed Plaintiff's failure to carry out certain work plan duties. Raffaelle Dep. 109-11; Jones Dep. 222. Jones testified that he did not discuss Plaintiff's termination with Raffaelle. Jones Dep. 199.

Plaintiff's position as Operations Manager was not replaced. Rather, RIT engaged a part-time, temporary employee that it later employed to perform clerical and administrative duties for Venture Creations. Gouger Decl. ¶ 33.

## I.      Claims against Boyd, Individually

Boyd retired as Vice President of Research on July 1, 2011. Boyd Aff. ¶ 1. Plaintiff asserts claims individually against Boyd based primarily upon his service as Interim Director of Venture Creations between December 2006 and mid-2007, which include: (1) that Boyd allegedly yelled at Plaintiff on January 24, 2007, regarding a conflict with another co-worker; (2) the delay in changing her title from Operations Coordinator to Operations Manager; (3) the FLSA reclassification from exempt to non-exempt in March 2007; (4) Boyd's participation in the November 16, 2009 meeting regarding deficiencies in Plaintiff's work performance. Pl. Dep. 90-92.

Plaintiff's complaints about her PA, the October 6, 2011 incident with Jones, and the termination of her employment do not relate to Boyd, as he had retired from his position of Vice President of Research before those incidents occurred. Boyd Aff. ¶ 1; Pl. Dep. 50. Plaintiff testified that Boyd did not make comments to her related to her race. Pl. Dep. 99. Rather, Plaintiff contends that her claims against Boyd are supported by the fact that he allegedly said: "it would be difficult to find a qualified AALANA[3] female for his division."   ECF No. 93 ¶ 38; Pl. Dep. 112-114. Plaintiff already worked in Boyd's division, and the comment was purportedly made during a

---

[3] "AALANA" stands for African American Latin American Native American. Pl. Dep. 114.

discussion regarding Plaintiff's involvement in RIT's Functional Diversity Council Committee. Boyd appointed Plaintiff to this committee to ensure that there was minority representation in RIT's Research Division. Boyd Aff. ¶ 27; Pl. Dep. 112-13. Boyd does not recall making this comment to Plaintiff. Boyd Aff. ¶ 29.

### J. Complaints of Discrimination

Before the commencement of and during this litigation, Plaintiff filed nine separate charges alleging discrimination and/or retaliation with the EEOC on or about the following dates: August 11, October 27, and December 16, 2009; September 26, October 5, October 6, October 12, and October 14, 2011; and October 1, 2012. Def. Atty. Decl. ¶ 11; Def. Appx. Exs. 6-14. The EEOC charges alleged that Plaintiff had been the victim of racial discrimination and retaliation in violation of Title VII, 42 U.S.C. § 1981, and the NYSHRL. Only Plaintiff's final charge alleges discrimination based on gender in connection with her termination. Def. Appx. Ex. 14. Some of the EEOC charges also allege that Plaintiff had been subjected to an alleged racially hostile work environment, but Plaintiff did not assert claims in her Second Amended Complaint of hostile work environment. ECF No. 93. All of Plaintiff's EEOC charges have been dismissed and notices of Plaintiff's right to sue have been issued with respect to each charge. Def. Appx. Exs. 15-19.

## DISCUSSION

## I. Summary Judgment Standard

Federal Rule of Civil Procedure 56 provides that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986); *see Matsushita Elect. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574

(1986). Regarding materiality, "only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson*, 477 U.S. at 248. More importantly, "summary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

Thus, the Court's function in deciding a summary judgment motion is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Id.* at 249. When a properly supported motion for summary judgment is made, the adverse party "must set forth specific facts showing that there is a genuine issue for trial. *Id.* at 250.

As the Second Circuit observed in *Duse v. Int'l Business Machines Corp.*, 252 F.3d 151, 158 (2d Cir. 2001), "in assessing the record to determine whether there is a genuine issue as to any material fact, the court is required to resolve all ambiguities and draw all factual inferences in favor of the party against whom summary judgment is sought." 252 F.3d 151, 158 (citing *e.g., Anderson*, 477 U.S. at 255). However, "if the undisputed facts reveal that there is an absence of sufficient proof as to one essential element of the claim, any factual disputes with respect to other elements of the claim become immaterial and do not suffice to defeat a motion for summary judgment." *Duse*, 252 F.3d at 158 (citing *e.g.*, *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *Burke v. Jacoby*, 981 F.2d 1372, 1379 (2d Cir. 1992), *cert. denied*, 508 U.S. 909 (1993); *Knight v. U.S. Fire Ins. Co.*, 804 F.2d 9, 11-12 (2d Cir. 1986) (the existence of a factual issue will not suffice to defeat a motion for summary judgment where that issue is not material to the ground of the motion), *cert. denied*, 480 U.S. 932 (1987)).

## II. *McDonnell Douglas* Burden Shifting

### A. Intentional Discrimination

Plaintiff alleges intentional employment discrimination based on her race in violation of Title VII, Section 296 of the NYSHRL, and 42 U.S.C. § 1981. The Court considers these claims in tandem. *See Ehrbar v. Forest Hills Hosp.*, 131 F. Supp. 3d 5, 32 (E.D.N.Y. 2015) (noting that Title VII and NYSHRL claims are analyzed using the same burden-shifting framework); *Brown v. City of Syracuse*, 673 F.3d 141 (2d Cir. 2012) (analyzing Title VII and Section 1981 cases under the same burden-shifting framework).

Title VII makes it an "unlawful employment practice for an employer . . . to discriminate against any individual with respect to [her] compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2. Claims brought under this provision are examined under the burden-shifting analysis the Supreme Court articulated in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–03 (1973).

Under this framework, a plaintiff must first establish a *prima facie* case of discrimination by demonstrating that: (1) she is a member of a protected class; (2) she was qualified for the position; (3) she suffered an adverse employment action; and (4) the adverse employment action occurred under circumstances giving rise to an inference of discrimination. *See Terry v. Ashcroft*, 336 F.3d 128, 137-38 (2d Cir. 2003); *Collins v. N.Y.C. Trans. Auth.*, 305 F.3d 113, 118 (2d Cir. 2002). The plaintiff's burden of proof at the prima facie stage is "*de minimis.*" *Weinstock v. Columbia Univ.*, 224 F.3d 33, 42 (2d Cir. 2000)

Once the plaintiff establishes a *prima facie* case of discrimination, the burden shifts to the employer "to articulate some legitimate, nondiscriminatory reason" for the employment action.

*McDonnell*, 411 U.S. at 802. In other words, "the defendant must clearly set forth, through the introduction of admissible evidence, reasons for its actions which, if believed by the trier of fact, would support a finding that unlawful discrimination was not the cause of the employment action." *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 507 (1993) (internal quotation marks omitted).

Upon the defendant's proffer of a legitimate nondiscriminatory reason for its employment action, "the presumption of discrimination arising with the prima facie case drops from the picture . . . and the plaintiff must then establish that the defendant's proffered reason is a mere pretext for actual discrimination." *Weinstock*, 224 F.3d at 42 (citing *St. Mary's*, 509 U.S. at 510-11).

To demonstrate pretext, the plaintiff must produce "sufficient evidence to support a rational finding that the legitimate, nondiscriminatory reasons proffered by the defendant were false, and that more likely than not discrimination was the real reason for the employment action." *Weinstock*, 224 F.3d at 42 (quotation marks and alterations omitted).

### B.      Retaliation

Claims of discriminatory retaliation are also subject to the *McDonnell Douglas* burden-shifting analysis. *See Kwan v. Andalex Grp. LLC*, 737 F.3d 834, 843 (2d Cir. 2013); *Hicks v. Baines*, 593 F.3d 159, 163-64 (2d Cir. 2010) (retaliation claims under the NYSHRL, Section 1981, and Title VII are analyzed under the *McDonnell Douglas* framework); *Vivenzio v. City of Syracuse*, 611 F.3d 98, 106 (2d Cir. 2010) (analyzing Section 1981 and NYSHRL discrimination claims under *McDonnell Douglas*).

Under the familiar burden-shifting framework, the plaintiff must first make out a *prima facie* case of retaliation. *See Kwan*, 737 F.3d at 844. Plaintiff's burden is *de minimis*—she need only provide admissible evidence from which a reasonable jury could infer a retaliatory motive. *E.g., Hicks*, 593 F.3d at 164. Once the plaintiff makes out her *prima facie* case, she creates a

presumption of retaliation, and the burden shifts to the defendant to provide "a legitimate non-retaliatory reason for the adverse employment action." *Kaytor v. Elec. Boat Corp.*, 609 F.3d 537, 552-53 (2d Cir. 2010). If the defendant meets its burden of production, it defeats the presumption of retaliation that the plaintiff's *prima facie* case created. *Hicks*, 593 F.3d at 164. The burden then shifts back to the plaintiff to demonstrate that the defendant's proffered reason is merely pretextual. *Kwan*, 737 F.3d at 845.

## III.    Analysis

Defendants argue that summary judgment is appropriate because: Plaintiff fails to establish discrimination and retaliation claims under Title VII; her individual claims against Boyd in his individual capacity fail as a matter of law; and some of her claims are time-barred. [4] Def. Mem. at 4-34.

The parties do not appear to dispute the first two elements of Plaintiff's *prima facie* case, and therefore the only issue at this stage of the analysis is whether an adverse employment action occurred under circumstances giving rise to an inference of discrimination.

### A.    Intentional Discrimination

#### 1.    <u>Adverse Action</u>

Defendant first contends that most of Plaintiff's complaints are not adverse employment actions for purposes of her discrimination claim. Def. Mem. 6-16.

To establish a *prima facie* case of discrimination a plaintiff must present evidence of an adverse employment action, which means that the "defendants must effect a materially adverse change in the terms and conditions of employment," which is "more disruptive than a mere

---

[4] Because the Second Circuit has a "clearly expressed preference that litigation disputes be resolved on the merits," *Mejia v. Castle Hotel, Inc.,* 164 F.R.D. 343, 346 (S.D.N.Y. 1996), the Court will address the merits of Plaintiff's claims, despite the possibility that some of her claims are time-barred.

inconvenience or an alteration of job responsibilities." *Sotomayor v. City of N.Y.*, 862 F. Supp. 2d 226, 253 (E.D.N.Y. 2012), *aff'd*, 713 F.3d 163 (2d Cir. 2013) (citations and quotations omitted). "Adverse employment actions include termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices unique to a particular situation." *Id.* Moreover, "actions that are 'trivial harms' – i.e., those petty slights or minor annoyances that often take place at work and that all employees experience – are not materially adverse." *Tepperwien v. Entergy Nuclear Operations, Inc.*, 663 F.3d 556, 568 (2d Cir. 2011) (internal quotations omitted).

The following actions are not adverse for purposes of the Title VII discrimination analysis: the delay in updating Plaintiff's title, the alleged failure to promote, the FLSA job reclassification, and the November 16, 2009 meeting. The Court briefly discusses those incidents.

In late 2006, Plaintiff's title was changed from Operations Coordinator to Operations Manager following a favorable PA. She received a three percent salary increase. Although Plaintiff began to use the new title immediately, the Human Resources software did not update her title until 2009. She does not dispute that the delay did not negatively impact her salary, benefits, or job responsibilities. Pl. Dep. 110-112. The error impacted only Plaintiff's title. Otherwise, a career advancement, promotion, or salary increase cannot be considered "adverse" to Plaintiff. The error was therefore an inconvenience at most, particularly in light of the fact that she used her new title immediately upon her promotion. *See, e.g., Leak v. United Techs. Corp.*, 81 F. Supp. 2d 373, 376 (D. Conn. 1999) ("In this instance, plaintiff's transfer, which resulted in promotion to a higher labor grade level, does not constitute an adverse employment action raising the inference of discrimination."); *see also, e.g., Galabya v. N.Y.C. Bd. of Educ.*, 202 F.3d 636, 640-41 (2d Cir.

2000) (administrative mistakes including delay in reassignment and incorrect assignment were not adverse employment actions where there was no evidence of career impact).

With regard to her claim that RIT failed to promote her, RIT records indicate that Plaintiff applied for four positions outside of Venture Creations. Plaintiff testified that she applied for: a counselor position with RIT's Higher Education Opportunity Program; a managerial position in the HUB Crossroads facility; Director of Orientation; and Business Manager in the Center for Arts and Sciences. Pl. Dep. 226-231. Plaintiff testified that she was not selected for the positions; did not know who was selected for the positions; did not feel she was not offered the positions in retaliation by RIT; but that "it could be possible" that RIT discriminated against her by not employing her in those positions if she were to "look at the nationality of the person sitting in the position." *Id.* at 233-36, 238, 241, 245, 248, 249, 250. She acknowledged that there was "major retaliation coming from RIT around the board," but "not with these four positions." *Id.* at 248-49. Plaintiff also testified that she did not have the requisite training and/or technical skills, and was unqualified for the positions for which she applied. Pl. Dep. 233-34, 238, 240-44. A plaintiff does not have a claim for a failure to promote where she was not qualified for the promotion. *Gutierrez v. City of N.Y.*, No. 08-6537, 2011 WL 7832709, at *6 (S.D.N.Y. 2011). Nor can she raise an issue of fact based on her own speculation or opinion that the failure to hire was discriminatory in nature. *See generally*, *Kerzer v. Kingly Mfg.*, 156 F.3d 396, 400 (2d Cir. 1998) ("[c]onclusory allegations, conjecture and speculation . . . are insufficient to create a genuine issue of fact") (citations omitted); *see also Ya-Chen Chen v. City Univ. of N.Y.*, 805 F.3d 59, 74-75 (2d Cir. 2015) ("a plaintiff's feelings and perceptions of being discriminated against do not provide a basis on which a reasonable jury can ground a verdict") (internal quotation marks and citation omitted).

Likewise, the FLSA job reclassification did not constitute an adverse employment action. With respect to reclassification, courts have found that if an employer improperly categorized a plaintiff as exempt from the FLSA's overtime compensation requirements and the plaintiff was denied overtime, she could satisfy the adverse employment action standard. *Sethi v. Narod*, 12 F. Supp. 3d 505, 528 (E.D.N.Y. 2014) (collecting cases). In contrast, the transition from Plaintiff's position from exempt to non-exempt provided her the opportunity to earn compensation for overtime hours worked. Plaintiff testified that her compensation was essentially unchanged, and that she was paid for overtime hours that she worked. Pl. Dep. 94-96. Although Plaintiff contends this was a demotion from a professional position to a clerical position, she does not proffer any admissible evidence in support of this claim. *Id.*; Pl. Aff. ¶ 42.

Finally, Plaintiff challenges the November 16, 2009 counseling meeting, during which she was accused of having an unprofessional attitude, hindering customers, starting rumors about Mahone (her then-supervisor), and not recording her time properly. ECF No. 93 ¶¶ 65-67. Although she now contends that after the meeting she had a "negative record that would further derail her career progress," Pl. Mem. 16, she testified that no further action was taken in connection with the allegations RIT staff made against her. Pl. Dep. 62.  Thus, Plaintiff alleges nothing more than criticism of her work performance, which is insufficient to meet her burden. "Excessive scrutiny, criticism, and negative evaluations of an employee's work are not materially adverse employment actions unless such conduct is accompanied by negative consequences, such as demotion, diminution of wages, or other tangible loss." *Opoku v. Brega*, No. 15-CV-2213, 2016 WL 5720807, at *7 (S.D.N.Y. Sept. 30, 2016) (collecting cases) (citations omitted).

Plaintiff appears to argue that the September 20, 2011 negative PA, temporary suspension in October of 2011, written warning dated September 27, 2011, and ultimate termination on May

1, 2012, when considered together, constitute an adverse employment action. Pl. Mem. 17. "Negative performance evaluations, formal reprimands, and counseling memoranda are not adverse employment actions for purposes of a disparate treatment claim unless accompanied by negative repercussions such as reduction in pay or an injury to a plaintiff's ability to secure future employment." *Babarinsa v. Kaleida Health*, 58 F.Supp.3d 250, 260 (W.D.N.Y. 2014), *aff'd*, 622 F. App'x 36 (2d Cir. 2015) (summary order). Here, Plaintiff has alleged multiple consequences flowing from the September 20, 2011 PA, including her termination from RIT. Accordingly, for purposes of this motion, she has established an adverse employment action as part of her *prima facie* case. She must still show, however, that "the action occurred under circumstances giving rise to an inference of discriminatory intent." *Mathirampuzha v. Potter*, 548 F.3d 70, 78 (2d Cir. 2008).

## 2. Inference of Discrimination

To that end, Plaintiff alleges that: she was the only African-American female working at Venture Creations; she was treated less favorably than Kelly, a Caucasian female co-worker; Boyd commented about "AALANA" professionals; she encountered pay disparities; and Jones treated her aggressively. Pl. Mem. 19-23.

The fact that Plaintiff was the only African-American female employed at Venture Creations, a new business incubator with approximately three full-time employees between 2007 and 2011, is of little probative value. *See Pearson v. Lynch*, No. 10 CIV. 5119, 2012 WL 983546 (S.D.N.Y. Mar. 22, 2012) (no inference of discrimination where terminated plaintiff was only male administrative assistant); *Anderson v. Hertz Corp.*, 507 F.Supp.2d 320, 329 (S.D.N.Y. 2007) ("The fact that Plaintiff was the only African-American Station Manager" did not "supply evidence sufficient for Plaintiff to establish a *prima facie* case of discrimination.").

Kelly, Plaintiff's Caucasian co-worker with whom she claims to be similarly-situated, is RIT's Controller and Assistant Treasurer. Plaintiff offers no proof that would establish that the two were similarly situated. Plaintiff never applied for her position and, although she claims that Kelly was promoted more frequently, Pl. Aff. ¶¶ 73, Kelly started working at RIT approximately 11 years before Plaintiff did. Boyd Aff. ¶¶ 24-25. Plaintiff also claims that the two women received their master's degrees around the same time, Pl. Mem. 20, but the citation provided does not support this proposition, and the Court can find no such evidence in the record as to when Kelly completed her advanced degree. *See* Pl. Opp'n Stmt. ¶ 36; Pl. Aff. ¶ 73. This is insufficient to establish that Plaintiff was treated differently than similarly situated employees, and therefore fails to give rise to a reasonable inference of discrimination. *See Lapsley v. Columbia Univ.-Coll. of Physicians & Surgeons*, 999 F. Supp. 506, 518 (S.D.N.Y. 1998) (Plaintiff and comparator not similarly situated where "even a superficial comparison of the two employees' qualifications and duties reveals differences in virtually every material respect.").

Next, Plaintiff states that Boyd privately called her in April of 2008 regarding an RIT diversity committee,[5] and informed her that it would be very difficult to find "three qualified AALANA professional females" for his division. Pl. Mem. 21. Plaintiff fails to connect this comment in any way to the aforementioned adverse employment actions, which are largely attributed to Jones and Raffaelle and occurred approximately three years after the alleged phone conversation occurred. "[V]erbal comments may raise an inference of discrimination, but not where they lack a 'causal nexus to the termination decision.'" *Luka v. Bard College*, 263 F. Supp. 3d 478, 487 (S.D.N.Y. 2017) (quoting *Williams v. Victoria's Secret*, No. 15-cv-4715, 2017 WL 1162908, at *8 (S.D.N.Y. Mar. 28, 2017)).

---

[5] Plaintiff documented the details of the phone conversation an e-mail with the subject: "Diversity Scorecard Information." Pl. Ex. 37.

With respect to her allegation of "pay disparity," Plaintiff proffers no evidence to support her argument that she "performed the work of Interim Director for years but was never properly compensated for her efforts." Pl. Mem. 22. To the extent she seeks to compare herself to Jones as a similarly-situated employee, such an argument would necessarily fail. "When determining whether employees are similarly situated, courts consider characteristics including the employees' education, work experience, and specific work duties." *Wallen v. Teknavo Grp.*, No. 12-CV-6196, 2018 WL 1278317, at *17 (E.D.N.Y. Feb. 22, 2018), *report and recommendation adopted sub nom.*, *Wallen v. Teknavo Grp.*, 2018 WL 1258782 (Mar. 12, 2018).

Here, Jones temporarily served as the Interim Director of Venture Creations in 2007, and later worked for RIT in 2008 as a part-time consultant. RIT ultimately hired him as the Executive Director of Venture Creations in May of 2011. Jones Dep. 20-24. His work history included facilities management at Syracuse University, Catholic University, and University of Maryland. *Id.* at 15-16. Upon returning to Rochester, Jones was a facilities supervisor at Harris Corporation, and then spent eight years as a project manager at Eastman Kodak. When Jones left Eastman Kodak, he was the Supervisor of Design and Drafting and managed a team of 30 to 40 people. *Id.* at 18. Jones then started his own facilities management company, which operated from 1987 to 2003 and had approximately 40 employees. *Id.* at 19. Jones had a Bachelor's in Architecture from Syracuse University, and took graduate courses in finance and operations at RIT over three years while he worked at Eastman Kodak. Although he did not receive an MBA at that time, he received extensive management training at Harris Corporation and Eastman Kodak. *Id.* at 14-15. Plaintiff, in contrast, had previously worked at Harter Secrest & Emery LLP in the collections department until 1992, after which she took temporary and/or part-time jobs until RIT hired her in 2003. Pl. Dep. 11-16, 18-25. She had a Bachelor's degree in business administration (1996) and a Master's

degree in management from Nazareth College (2003). Unlike Jones, Plaintiff did not have supervisory or entrepreneur experience, and Venture Creations is a new business incubator. Thus, Plaintiff has not established that she is "similarly situated in all material respects" to Jones. *Graham v. Long Island R.R.*, 230 F.3d 34, 39 (2d Cir. 2000) (quotations omitted).

Finally, Plaintiff points to Jones's "aggressive" behavior to support an inference of discrimination:

> The aggressive treatment of Jones towards Plaintiff only grew over time, culminating in threats. Once Plaintiff made a complaint that he was harassing her as a Black Female, Jones began to stalk Plaintiff, take meticulous notes as suggested by Human Resources and look for an opportunity to fire her. Jones was treated far better than Plaintiff in every aspect including discipline. Jones was able to threaten a Black female (Plaintiff) and keep his job.

Pl. Mem. 23. Plaintiff does not specify what remarks, actions, or threats Jones made toward her.

Jones testified that on October 6, 2011, he and Plaintiff had an altercation regarding flooring contractors working noisily in the Venture Creations building. Jones Dep. 32. Plaintiff, who was responsible for coordinating contractors and work in the building, was not present at 9:00 a.m. when the contractors arrived. *Id.* Jones waited for her and asked her to "take action" when she arrived, but nothing happened. Jones went to Plaintiff's office but "her door was locked. [He] knocked. She did not open it. [He] went down to the contractor, asked him to stop the work and went back to [his] office." *Id.* at 33. When Jones finally met Plaintiff in the general office area, he "informed Plaintiff that [he] had taken the action to stop the contractors. She started yelling at [him] that this was harassment . . . . She was making the claim very loudly in a public area. So [he] turned around and left and went straight to HR." *Id.* at 39. During an interview with Gouger, Jones called Plaintiff "insubordinate" and "incompetent" and demanded that Gouger "transfer her

somewhere else." *Id.* at 38. Jones stated: "If you fire me over this I will sue the hell out of this school." *Id.*

RIT suspended Plaintiff and Jones for one week with pay over the incident, and Jones was relieved of his supervisory duties with respect to Plaintiff. Plaintiff does not present admissible evidence of differential punishment. *See, e.g.*, *Stepheny v. Brooklyn Hebrew Sch. for Special Children*, 356 F. Supp. 2d 248, 260 (E.D.N.Y. 2005) (at summary judgment stage, holding that plaintiff, whom employer terminated for engaging in workplace altercation, failed to offer evidence of discriminatory intent in part because coworker outside of protected class was also fired for engaging in same altercation). Plaintiff also does not allege that the altercation with Jones had racial overtones, or that it was motivated by her race or gender. *See Mohawk v. William Floyd Sch. Dist.*, 13-CV-2518, 2014 WL 838162, at *3 (E.D.N.Y. Mar. 3, 2014) (dismissing a claim where the plaintiff "failed to allege any facts, besides his own subjective belief, that plausibly suggest that the altercations . . . were in any way connected to his race, color, or national origin"); *Brodt v. City of N.Y.*, 4 F. Supp. 3d 562, 568 (S.D.N.Y.2014) ("A plaintiff's feelings and perceptions of being discriminated against are not evidence of discrimination.") (internal quotation marks omitted). On these facts, Plaintiff cannot establish that the circumstances of the adverse actions give rise to an inference of discrimination.

For all of the reasons stated, Plaintiff has failed to carry her burden to establish a *prima facie* case of discrimination by RIT.

### 3.  **Legitimate, Nondiscriminatory Reasons**

Even assuming Plaintiff met her initial burden, RIT articulated legitimate, nondiscriminatory reasons for the adverse employment actions. *See James v. New York Racing Ass'n*, 233 F.3d 149, 154 (2d Cir. 2000). The adverse employment actions at issue here are

Plaintiff's negative 2011 PA and written warning, her suspension with pay, and the final written warning and employment termination.

With respect to the 2011 PA and written warning, Plaintiff had numerous performance deficiencies including tardiness, failing to schedule vacations or time off in advance, conflicts with co-workers, failure or refusal to take direction from superiors, and failure or refusal to perform assigned tasks. Indeed, Plaintiff's own rebuttal to the PA indicated that she declined an offer to work on a project that was "mundane," and she believed it did not present an opportunity to be "creative or innovative." Def. Appx. Ex. 25 at 4. Likewise, she refused to retrieve office supplies for Jones on another occasion because he knew where they were located. Plaintiff stated: "Why is it my responsibility to deliver the folders to him? I am not his administrative assistant. I am the operations manager." *Id.* at 4-5. She stated that she did not "need instruction or guidance" from Jones on her job duties. *Id.* at 5. With regard to Plaintiff's failure to arrive at work on time, she admitted as much, but that this was the "first time anyone has complained about what time [she] arrived at the office." *Id.* She asserts that she required schedule flexibility because she was contemporaneously pursuing her higher education studies, and that RIT should have "been trying to leverage [her] educational accomplishment to their advantage." *Id.* Although Plaintiff clearly disagrees with the contents of the PA, the evidence is sufficient to satisfy Defendant's burden of production at this step. *See Wesley-Dickson v. Warwick Valley Cent. Sch. Dist.*, 973 F. Supp. 2d 386, 404 (S.D.N.Y. 2013) (finding that "defendants have offered a legitimate, nondiscriminatory reason" for their adverse employment action against the plaintiff, noting "plaintiff's history of performance problems . . . with respect to her writing skills and attention to detail"); *Potash v. Fla. Union Free Sch. Dist.*, 972 F. Supp. 2d 557, 591 (S.D.N.Y. 2013) ("Poor work performance always

constitutes a legitimate and nondiscriminatory reason for terminating employment.") (citation and internal quotation marks omitted).

Next, it is undisputed that an altercation occurred between Plaintiff and Jones on October 6, 2011. RIT suspended both of them with pay for the same amount of time while it investigated the incident. Plaintiff was permitted to return to work within one week. Where, as here, the evidence demonstrates that the employer suspended an employee pending an investigation into a confrontational incident between employees, it has provided a legitimate, nondiscriminatory reason for that suspension. *Jean v. Acme Bus Corp.*, No. CV 08-4885, 2012 WL 4171226, at *12 (E.D.N.Y. Sept. 19, 2012) ("[T]he record shows that defendants suspended plaintiff for legitimate business reasons (pending an investigation by the Company's customer into complaints of inappropriate conduct between two of its employees) and not for any discriminatory or retaliatory animus.").

Finally, RIT had a legitimate, nondiscriminatory reason for giving Plaintiff a written warning and ultimately terminating her employment. She was counseled about her performance in November of 2009 and received a negative PA on September 20, 2011, in which she received an overall rating of 1.8 out of 5. Regardless of RIT's advisements, Plaintiff's work deficiencies and relationships with her co-workers did not improve. A written warning was issued September 27, 2011, noting various other recurring deficiencies in her performance. This satisfies Defendants' burden. *See Forrester v. Prison Health Servs., Inc.*, 651 F. App'x 27 (2d Cir. 2016) ("Misconduct, excessive lateness, and poor performance are legitimate, nondiscriminatory reasons for defendants' adverse actions."); *Jones v. Yonkers Pub. Sch.*, 326 F. Supp. 2d 536, 544 (S.D.N.Y. 2004) (poor performance in carrying out duties and in relationships with supervisors and co-workers is a legitimate, nondiscriminatory reason for termination).

Later, after Plaintiff began reporting to Rafaelle, he and HR Representative Judy Bender developed a work plan to assist Plaintiff in understanding and successfully completing her job functions. Plaintiff met with Rafaelle and Bender to discuss the work plan, and expressed to them that she was fully capable of performing its functions. During a meeting on May 1, 2012, Plaintiff admitted that she did not perform all of the tasks expected of her from the work plan. RIT later terminated her employment. Defendant has presented legitimate, nondiscriminatory reasons for Plaintiff's warnings and termination. *See Nolley v. Swiss Reinsurance Am. Corp.*, 857 F. Supp. 2d 441, 460 (S.D.N.Y. 2012), *aff'd sub nom.*, *Nolley v. Swiss Re Am. Holding Corp.*, 523 F. App'x 53 (2d Cir. 2013) (summary order) (failure to perform duties outlined in performance improvement plan was legitimate, nondiscriminatory reason for termination).

### 3. Pretext

Because Defendant proffered legitimate, nondiscriminatory reasons for the actions taken against Plaintiff, Plaintiff must show that these reasons are a pretext for wrongful discrimination under the *McDonnell Douglas* analysis. In doing so, she cannot merely demonstrate that the employer's proffered nondiscriminatory reason is untrue or incomplete; she must also show that discrimination was at least a substantial motivating factor for the employer's adverse action. *See Henry v. Wyeth Pharm., Inc.*, 616 F.3d 134, 156-57 (2d Cir. 2010). In considering evidence of discrimination, the Court is conscious that discrimination "will seldom manifest itself overtly" and that it must "carefully distinguish between evidence that allows for a reasonable inference of discrimination and evidence that gives rise to mere speculation and conjecture." *Bickerstaff v. Vassar Coll.*, 196 F.3d 435, 448 (2d Cir. 1999) (citations and alterations omitted).

Plaintiff attempts to establish pretext by maintaining that she "consistently met all expectations at work." Pl. Aff. ¶ 106. The record evidence, however, does not support Plaintiff's

opinion of her work product and, more importantly, amounts to nothing more than a disagreement with her supervisors over the quality of her work, which does not create a triable issue of fact regarding pretext. *See, e.g.*, *Wu v. Metro-N. Commuter R.R. Co.*, No. 14CV7015, 2016 WL 5793971, at *13 (S.D.N.Y. Aug. 4, 2016) ("[P]laintiff has pointed to no admissible evidence, other than his own disagreements with Defendants regarding the quality of his work performance, to support his assertion that this proffered rationale is actually pretext for discrimination."); *Paddock v. SUNY Brockport*, 418 F. Supp. 2d 288, 295 (W.D.N.Y. 2006) (citing *Holt v. KMI-Continental, Inc.*, 95 F.3d 123, 130 (2d Cir. 1996)).

Finally, Plaintiff's inability to get along with her co-workers cannot be disputed on this record, *see* Pl. Aff., Ex. 19 (e-mail correspondence accusing co-worker of "acting like a two year old"); Pl. Dep. 85-87, 133-155, 193 (testifying that one of her work requirements was that she "would not have to work with a bunch of women"), nor can her suspension due to a workplace altercation. Thus, there is nothing to suggest that any of these reasons for her suspension, negative evaluations, and ultimate termination were untrue.

Significantly, none of Plaintiff's challenges to RIT's proffered reasons have anything to do with race. There is no evidence to rebut RIT's legitimate, nondiscriminatory reason for terminating her employment: Plaintiff's lengthy, documented history of performance issues and workplace conflict. Plaintiff has set forth no evidence to demonstrate that her race was a factor, much less a motivating factor, in RIT's determination to sanction her and terminate her employment. *See Ferraro v. Kellwood Co.*, 440 F.3d 96, 100 (2d Cir. 2006) (affirming grant of summary judgment in discrimination case where plaintiff's claim of pretext was unsupported by any evidence other than her own speculation).[6]

---

[6] Despite her voluminous submissions and additional briefing, little is mentioned of Plaintiff's purported gender discrimination claim based upon her termination. In the event Plaintiff has not abandoned this claim,

## B.      Retaliation

As stated earlier, retaliation claims are analyzed under the *McDonnell Douglas* burden-shifting framework:

> Under this framework, the plaintiff bears the initial burden to
> establish a prima facie case of retaliation by offering evidence that
> she "participated in a protected activity," "suffered an adverse
> employment action," and "that there was a causal connection
> between her engaging in the protected activity and the adverse
> employment action." *Gorzynski v. JetBlue Airways Corp*., 596 F.3d
> 93, 110 (2d Cir. 2010). This showing creates a "presumption of
> retaliation," which the defendant may rebut by "articulating a
> legitimate, non-retaliatory reason for the adverse employment
> action." *Jute v. Hamilton Sundstrand Corp*., 420 F.3d 166, 173 (2d
> Cir. 2005). If the defendant provides such an explanation, "the
> presumption of retaliation dissipates," *id*., and the plaintiff must
> prove "that the desire to retaliate was the but-for cause of the
> challenged employment action." *Univ. of Tex. Sw. Med. Ctr. v.
> Nassar*, [570 U.S. 338, 352 (2013)].

*Ya-Chen Chen*, 805 F.3d at 70 (2d Cir. 2015) (alteration added).[7] To make out a *prima facie* case

of retaliation, a plaintiff must show that: (1) "she was engaged in a protected activity;" (2) the

employer "was aware of this activity;" (3) the employer "took adverse action against her;" and (4)

"a causal connection existed between the protected activity and the adverse action." *Valleriani v.

Route 390 Nissan LLC*, 41 F. Supp. 3d 307, 318 (W.D.N.Y. 2014) (citing *Sista v. CDC Ixis N.

Am., Inc*., 445 F.3d 161, 177 (2d Cir. 2006)).

---

there is nothing in the record to support such a claim and it would also be subject to dismissal for the same
reasoning discussed above.

[7] The Court applies the "but-for" standard to Plaintiff's Section 1981 and NYSHRL claims as the parties
do not dispute the appropriate standard. *See Alvarado v. Norstrom, Inc.,* 685 F. App'x 4, 7-8 (2d Cir. 2017)
(summary order) (noting that Section 1981 and NYSHRL claims are analyzed according to same principles
as Title VII claims and affirming the dismissal of the Section 1981 and NYSHRL claims because the record
lacked sufficient evidence to support plaintiff's argument under the but-for standard); *Varno v. Canfield*,
664 F. App'x 63, 66 (2d Cir. 2016) (summary order) (applying but-for standard, citing *Nassar*). In any
event, Plaintiff's claims would fail under the lesser standard, which requires that the alleged retaliation was
a "substantial or motivating factor" in her termination. *Kwan* 737 F.3d at 846 n.5 (quoting *Raniola v.
Bratton*, 243 F.3d 610, 625 (2d Cir. 2001)); *see also id.* at 845 n.7 (declining to reach question of whether
*Nassar* applied to the NYSHRL "because the plaintiff's claims survive under the *Nassar* but-for standard").

1. **Protected Activity**

Although the parties do not appear to dispute that the first two elements of Plaintiff's *prima facie* case have been met, the Court identifies the following instances of protected activity to form the basis of Plaintiff's retaliation claim: commencement of this lawsuit in September of 2010; five separate EEOC charges in September and October of 2011; two internal complaints against Jones alleging harassment in September of 2011; a written rebuttal to the negative PA in September of 2011; and an EEOC charge in October of 2012. Pl. Mem. 26; Def. Stmt. ¶ 106.

2. **Adverse Action**

Although the standard for establishing an adverse action in the retaliation context is not as stringent as in the discrimination context, *Gelin v. Geithner*, No. 06-CV-10176, 2009 WL 804144, at *20 (S.D.N.Y. Mar. 26, 2009), *aff'd*, 376 F. App'x 127 (2d Cir. 2010) (summary order), the Court nonetheless finds that only incidents occurring in the Fall of 2011 through the Spring of 2012 suffice to support Plaintiff's claim.[8]

The allegations regarding Plaintiff's title change, FLSA status change, and the November 2009 counseling meeting in which her performance was criticized, do not amount to materially adverse employment actions in the absence of any negative consequences.[9] Indeed, other courts in this Circuit have rejected similar complained-of activities. *See Mitchell v. SUNY Upstate Med. Univ.*, 243 F. Supp. 3d 255, 279 (N.D.N.Y. 2017) (stating that, even in the retaliation context, "[e]xcessive scrutiny, criticism, and negative evaluation of an employee's work are not materially

---

[8] For purposes of a Title VII retaliation claim, an adverse employment action is one that is "materially adverse to a reasonable employee or job applicant," and actions are "materially adverse if they are harmful to the point that they could well dissuade a reasonable worker from making or supporting a charge of discrimination." *Hicks*, 593 F.3d at 165 (quotations omitted).

[9] Plaintiff does not allege retaliation in connection with her previous claim that RIT failed to promote her when it did not hire her for the four positions for which she applied. Pl. Opp'n Stmt. ¶ 30.

adverse employment actions unless such conduct is accompanied by negative consequences, such as demotion, diminution of wages, or other tangible loss") (internal citations and quotation marks omitted); *Jaeger v. N. Babylon Union Free Sch. Dist.*, 191 F. Supp. 3d 215, 235 (E.D.N.Y. 2016) ("[T]he caselaw does not support the conclusion that Principal Klomp's monitoring of Jaeger's attendance, even if it differed from the scrutiny given to his colleagues, is sufficient to constitute an adverse employment action."); *Verdi v. City of N.Y.*, No. 17-CV-1755, 2018 WL 557895, at *5 (S.D.N.Y. Jan. 22, 2018) (meeting and subsequent counseling memorandum did not support a Title VII retaliation claim). Plaintiff must next show a causal connection between her protected activity and the negative PA, written warning, temporary suspension, and termination.

### 3.   Causation

Plaintiff urges the Court to find the temporal proximity between the protected activity and the adverse actions sufficient to establish a causal connection. Pl. Mem. 27-29.

> A plaintiff can show a sufficient causal connection between the protected activity and the adverse employment action either (1) indirectly, by showing that the protected activity was followed closely by discriminatory treatment, or through other circumstantial evidence such as disparate treatment of fellow employees who engaged in similar conduct; or (2) directly, through evidence of retaliatory animus directed against the plaintiff by defendant.

*Woods v. Enlarged City Sch. Dist. of Newburgh*, 473 F. Supp. 2d 498, 528 (S.D.N.Y. 2007), *aff'd sub nom.*, *Woods v. Newburgh Enlarged City Sch. Dist.*, 288 F. App'x 757 (2d Cir. 2008) (summary order) (quotations omitted).

Plaintiff received a negative PA on September 20, 2011, followed by a written warning on September 27, 2011; and she was suspended with pay on October 6, 2011, after the incident with Jones. A final written warning dated April 3, 2012, was issued upon her return to work after sick leave, and she was ultimately terminated on May 1, 2012. She filed five separate EEOC charges

in September and October of 2011 (September 26, October 5, October 6, October 12, and October 14); two internal complaints against Jones alleging harassment on September 28, 2011; a written rebuttal to the negative PA on October 3, 2011; and an EEOC charge dated October 5, 2012.

The Court assumes that the close temporal proximity is enough to establish the required causal connection for a *prima facie* case of retaliation but concludes that, like Plaintiff's intentional discrimination claim, she cannot establish pretext. *See generally*, *Gorman-Bakos v. Cornell Coop. Extension of Schenectady Cnty.*, 252 F.3d 545, 554 (2d Cir. 2001) (Second Circuit "has not drawn a bright line to define the outer limits beyond which a temporal relationship is too attenuated to establish a causal relationship.").

### 4. Legitimate, Nondiscriminatory Reason, Pretext

Defendants set forth a multitude of legitimate, nondiscriminatory reasons for the actions taken against Plaintiff in late 2011 and early 2012. The burden thus returns to Plaintiff to establish that these reasons were pretextual by showing that the explanations Defendant offered were false and that retaliation was the "but for" cause of Defendant's actions. *Vosburgh v. Amer. Nat. Red Cross*, 08-CV-0653, 2014 WL 4826688, at *9 (N.D.N.Y. Sept. 29, 2014) ("An employer's reason for an adverse action cannot be proven to be a pretext for retaliation unless it is shown to be false and that retaliation was the real reason.") (alterations omitted); *see also Nassar*, 570 U.S. at 352 (requiring the plaintiff to demonstrate that action would not have been taken but for retaliatory animus). The Second Circuit has held that temporal proximity alone is insufficient to demonstrate pretext. *Kwan*, 737 F.3d at 847.

Here, Plaintiff offers no evidence that would suggest the reasons for her negative PA, suspension, warning, and termination, were false. To the contrary, the record establishes that

Plaintiff admitted to many of her shortcomings, had been the subject of scrutiny for several years, and failed to correct her performance deficiencies after being placed on informal and formal notice.

The August 2007 PA that Boyd authored indicates that Plaintiff received a 3/5 performance rating, advising that she "need[ed] to work with [Mahone, incoming Executive Director] and be responsive to all of the functions and needs of the incubator." Pl. Ex. 47. Boyd acknowledged that Plaintiff had not "always received clear directions from these various managers," and that she was "not always . . . happy with [Venture Creations]." *Id.* The 3/5 or "average" rating was unchanged from Plaintiff's 2005 PA that Boyd also issued. Pl. Ex. 36. The evidence therefore belies her assertion that she had an "exceptional performance history" and an "excellent" record. Pl. Mem. 14-15.

To the extent Plaintiff argues that her negative 2011 PA and resulting termination were pretextual because her performance was more sharply criticized under Jones's management than Boyd's, courts in this Circuit have recognized that "[a] new manager is allowed to appraise an employee's work according to his or her own expectations, even if those expectations are contrary to a prior manager's expectations," and "inconsistenc[ies]" in performance evaluations resulting from a change in management thus do "not support a finding of pretext." *Orisek v. Am. Inst. of Aeronautics & Astronautics*, 938 F. Supp. 185, 191 (S.D.N.Y. 1996) (internal quotation marks omitted); *see also Pergament v. Fed. Express Corp.*, 03-cv-1106, 2007 WL 1016993, *12 (E.D.N.Y. Mar. 30, 2007) ("fact that [employee] had received generally positive evaluations from her previous . . . supervisor" did not support finding of pretext in defendant's decision to terminate plaintiff based new supervisor's negative assessments). Significantly, Jones, who had prepared the negative PA, was not the subject of any EEOC charge until *after* he issued the evaluation on September 19, 2011.

Throughout her Opposition papers, Plaintiff repeatedly expresses her dissatisfaction with her work assignments, which were largely administrative and clerical. Pl. Aff. ¶¶ 38, 54-55, 61, 63, 65, 74, 81, 83, 103-04, 169-70. Yet, during her deposition, Plaintiff stated that she was responsible for various administrative tasks, and RIT's announcement of her appointment to Operations Coordinator in 2003 described her functions to include coordination of incubator activities and utilization of shared meeting rooms, arranging meetings, and serving as the point-of-contact for inquiries and building related matters. Pl. Dep. 65-70, 112; Pl. Ex. 4. It further stated that her role would "grow over time to include marketing functions." *Id.* Plaintiff's subjective belief that her job duties were in "management/general business operations" and not clerical in nature is unsupported by the record and is also irrelevant as to whether RIT's adverse actions were motivated by retaliation.

Likewise, although Plaintiff claims that she wanted to perform accounting work, for which she believed she was qualified to do, Pl. Aff. ¶ 38, RIT Controller Kelly wrote to Boyd in 2006: "in my estimation [Plaintiff] does not possess any accounting skills. She performs administrative tasks only . . . . I attempted to teach her certain basic accounting skills such as setting up receivables when billing customers, recording accruals at year end and reconciling accounts. It ended up being more of an effort than I would have thought." Pl. Ex. 12. Thus, Plaintiff's desire to perform unidentified "professional" tasks, *see* Pl. Aff. ¶ 14, does not establish pretext. Indeed, her own submissions undermine many of the assertions made in her affidavit concerning her job duties and qualifications, and her unwillingness to work outside of her (largely clerical) job description.

Plaintiff's conflict with her co-workers was longstanding. Plaintiff's Exhibits 19-20 show e-mail correspondence documenting disputes with co-worker Rohr beginning in 2007, in which, among other things, she told Rohr to stop the "child's play." *Id.* Plaintiff further testified that Rohr

"fabricated events" and was "resentful" of Plaintiff's pursuit of a doctoral degree and acknowledged yelling at Rohr in the workplace "maybe four times." Pl. Dep. 133-37, 149-50.

Plaintiff testified that she had "a problem" with another woman, Andrea Napoli, in 2008. *Id.* at 141-42. The problem revolved around Plaintiff's disagreement with Napoli's "tone" after Plaintiff had "missed some invoices," which were admittedly Plaintiff's mistake. *Id.* at 146.

Plaintiff also "had problems" at RIT with other personnel beginning in 2004, and in 2006 accused Kelly of "interfering" with her career growth. *Id.* at 158.

Another co-worker, Richard DiMartino, allegedly made a comment toward Plaintiff in 2007 "[in] a disrespectful way." *Id.* at 181. Plaintiff asserted that: "It was in the tone, as though, you know, he was better than me." *Id.* Finally, Plaintiff testified that there was "always a problem when a lot of women are around . . . the false accusations, the strife, the jealousy." *Id.* at 194. She claimed that she experienced those issues with women at RIT and two of her former jobs. *Id.*

Plaintiff's performance issues were also well-documented. She conceded that: (1) she gave negative responses to Jones when he asked her to perform various tasks, such as, "I know how to do my job;" (2) she failed to arrive at work on time because she was not required to be on time; and (3) she had an altercation with Jones for which she was suspended. Pl. Dep. 267, 270-71, 289. Additionally, Plaintiff refused certain work duties, failed to inform Jones of the status of work-related issues, and, in response to an e-mail to Plaintiff addressing her non-responsiveness and other professional issues, Plaintiff accused Jones of "harassment." Def. Ex. 24; Pl. Aff. ¶ 104; Pl. Ex. 70; Gouger Decl. Ex. 4.

Aside from temporal proximity, Plaintiff presents no evidence that her protective activity caused RIT's negative PA. *See, e.g., Kwan*, 737 F.3d at 847 ("Temporal proximity alone is insufficient to defeat summary judgment at the pretext stage.").

Even after Plaintiff was no longer reporting to Jones and scheduled for alternating office hours at Venture Creations, her performance under Raffaelle continued to suffer. Although she was given a work plan that outlined her work expectations more clearly, she complained that the job was not properly defined. Def. Appx. Ex. 25, Pl. Dep. 394. Despite her assurances that she would accomplish the tasks enumerated on the work plan, she ultimately did not do so. Pl. Dep. 303-07, 344-45, 350. Plaintiff's affidavit, in contrast, now states that the work plan was "unrealistic and impractical." Pl. Aff. ¶ 165. She contends that she could not perform the tasks assigned because she was only in the office for nine days in the month of April, yet she inexplicably took eight vacation days to work on her doctoral degree. Pl. Aff. ¶ 167. Plaintiff offers no evidence to show that RIT's purported reason for her ultimate termination—her failure to manage her time and perform the work plan duties—was false. There is simply no showing on this record that demonstrates "that the desire to retaliate was the but-for cause of the challenged employment action." *See Ya-Chen Chen*, 805 F.3d at 73 (quotation omitted). Indeed, many of Plaintiff's performance issues arose before 2009, when she began to complain to RIT and the EEOC about the alleged discriminatory practices she encountered. *See Slattery v. Swiss Reinsurance Am. Corp.*, 248 F.3d 87, 95 (2d Cir. 2001) ("[W]here timing is the only basis for a claim of retaliation, and gradual adverse job actions began well before the plaintiff had ever engaged in any protected activity, an inference of retaliation does not arise."). Plaintiff does not show that retaliation was a motivating factor or the but-for cause of any of her adverse employment actions.

### 4.    Cat's Paw Liability

Plaintiff also relies upon the so-called cat's paw theory of liability on the basis that "Jones had predetermined that he would terminate or give Plaintiff a negative review" and he was

"pushed" by RIT for "more documentation related to poor performance whenever possible." Pl. Mem. 33 (citing Jones Dep. at 244-45).

The Second Circuit explained in *Vasquez v. Empress Ambulance Service, Inc*., 835 F.3d 267 (2d Cir. 2016), that the "cat's paw" theory of liability "refers to a situation in which an employee is fired or subjected to some other adverse employment action by a supervisor who himself has no discriminatory motive, but who has been manipulated by a subordinate who does have such a motive and intended to bring about the adverse employment action." *Id.* at 272. "[A]n employer may be liable for a supervisor's act that is (1) motivated by animus; (2) intended to cause an adverse employment action; and (3) a proximate cause of the ultimate employment action." *Kasiotakis v. Macy's Retail Holdings, Inc.,* No. 14 CIV. 462, 2015 WL 6125356, at *12 (S.D.N.Y. Oct. 16, 2015).

Plaintiff's argument is unpersuasive. The only evidence Plaintiff offers to support her assertion that Jones's discriminatory animus influenced Rafaelle is that Jones was one of five individuals that Rafaelle contacted to confirm whether Plaintiff completed certain tasks from the work plan and that Jones had a previous history of workplace conflict with Plaintiff. Pl. Mem. 33-34. This, however, does not support Plaintiff's claim that Rafaelle and/or RIT acted negligently in Plaintiff's termination. To the contrary, the evidence shows that Jones no longer had authority and supervision over Plaintiff, and, although Jones was consulted before the termination, Rafaelle also spoke with four other individuals, two tenants, and Plaintiff to garner information as to whether Plaintiff performed her assigned duties. Plaintiff admitted that she did not complete the assigned tasks.

Moreover, there is no evidence that describes or demonstrates what role Jones played with respect to Rafaelle and how this could have influenced Rafaelle's termination decision. Plaintiff

needs at least some evidence, circumstantial or otherwise, of a causal connection between Jones's discriminatory animus towards Plaintiff and RIT's termination of Plaintiff's employment by Rafaelle.[10] Without that causal connection, discriminatory intent cannot be inferred and Plaintiff cannot establish a retaliation claim based upon the cat's paw theory.

### C.  Individual Claims against Boyd

An individual's personal liability under 42 U.S.C. § 1981 "must be predicated on the actor's personal involvement." *Patterson v. Cnty. of Oneida*, 375 F.3d 206, 229 (2d Cir. 2004). Section 296(6) of the NYSHRL similarly requires that the defendant "actually participated" in the discriminatory/retaliatory action. *Beattie v. Guilderlan Cent. Sch. Dist.*, 124 F. Supp. 2d 802, 805 (N.D.N.Y. 2000) ("Individuals may be personally liable under the NYSHRL and § 1981 where the individual possessed power to do more than carry out personnel decisions made by others, or is shown to have actually participate[d] in the conduct giving rise to a discrimination claim."); *Karam v. Cnty. of Rensselaer*, 13-CV-1018, 2016 WL 51252, at *18 (N.D.N.Y. Jan. 4, 2016) (citations and internal quotation marks omitted); *accord Littlejohn v. City of N.Y.*, 795 F.3d 297, 314 (2d Cir. 2015) ("An individual may be held liable under §§ 1981 and 1983 only if that individual is personally involved in the alleged deprivation.") (citations and internal quotation marks omitted); *Vosburgh*, 2014 WL 4826688, at *13 ("To be found liable under [New York Executive Law § 296(6)], an individual need not have supervisory or hiring and firing power but still must have actually participated in the conduct giving rise to the claim of discrimination and engaged in direct, purposeful, participation.").

Personal involvement may be established by evidence showing: (1) direct participation in the alleged constitutional violation; (2) defendant's failure to remedy the wrong after being

---

[10] Plaintiff submits an exhibit purporting to evidence Jones's animus, but the 25-page submission consists of unidentified and possibly unauthenticated documents. Pl. Ex. 99.

informed of the violation through a report or appeal; (3) creation of a policy or custom under which unconstitutional practices occurred, or allowing such a policy or custom to continue, (4) gross negligence in supervising subordinates who committed the wrongful acts, or (5) deliberate indifference by failing to act on information indicating that unconstitutional acts were occurring. *Littlejohn*, 795 F.3d at 314.

Courts in this Circuit have found personal involvement to exist where, for example, the individual defendant (1) signed a written notice that the plaintiff would not be reinstated, or (2) was involved in the decision to terminate the plaintiff. *See, e.g., Pinero v. Long Island State Veterans Home*, 375 F. Supp. 2d 162, 169 (E.D.N.Y. 2005) (finding defendant personally involved where the complaint alleged that defendant "was the individual that signed the letter that informed [plaintiff] that she would not be reinstated" and "was personally involved in the decision to terminate the Plaintiff").

Plaintiff vaguely argues that "Boyd was personally involved in the decision making of these adverse actions. He sanctioned the conduct despite Plaintiff complaining to him on many occasions. He failed to take any steps to correct the situation." Pl. Mem. 29-30. Yet her lone piece of evidence in support of this contention is the alleged AALANA comment, which she characterizes as a "derogatory statement about professional minority women which set the tone of his extensive disparate treatment against Plaintiff." Pl. Mem. 29.

First, Plaintiff submits no evidence to support her contention that Boyd was responsible for the delay in her title change, the FLSA re-classification of her position, and lack of promotions. To the contrary, the record indicates that the delay in her title change was an error attributable to RIT's Human Resources software, the FLSA re-classification was a campus-wide Human Resources initiative, and the circumstances surrounding the alleged lack of promotional

opportunities involved her application for four job positions at RIT, outside of Boyd's purview, for which she was not selected and admittedly unqualified for. The remaining adverse actions occurred after Boyd's retirement in 2001. The AALANA comment was, at most, a stray remark that does not show Boyd was motivated by discrimination, and has no demonstrable connection to the aforementioned adverse employment actions Plaintiff alleges. *White v. Andy Frain Servs., Inc.*, 629 F. App'x 131, 134 (2d Cir. 2015) (summary order) (a "stray remark" is a comment that bears no direct causal connection to the adverse employment action). Accordingly, Plaintiff's claims against Boyd must be dismissed. *See, e.g., Evans-Gadsden v. Bernstein Litowitz Berger & Grossman, LLP*, 332 F. Supp. 2d 592, 597 (S.D.N.Y. 2004) (dismissing complaint upon Rule 12(b)(6) motion to dismiss where actions of individual defendants were not racially motivated).

Plaintiff's retaliation claim therefore fails as a matter of law.

## CONCLUSION

Defendant's Motion for Summary Judgment (ECF No. 132) is GRANTED, and the Amended Complaint (ECF No. 93) is DISMISSED WITH PREJUDICE. The Clerk of the Court is directed to enter judgment and to close this case.

IT IS SO ORDERED.

Dated: March 28, 2018
Rochester, New York

_____
HON. FRANK P. GERACI, JR.
Chief Judge
United States District Court